2024 IL App (1st) 231918
No. 1-23-1918
Opinion filed June 28, 2024

SIXTH DIVISION

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re*., J.W. a Minor, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 20 JA 1299 |
| | ) | |
| A.J., | ) | The Honorable |
| | ) | Peter J. Vikelis, |
| Respondent-Appellant.) | ) | Judge, presiding. |

PRESIDING JUSTICE ODEN JOHNSON delivered the judgment of the court, with opinion.
Justices Hyman and C.A. Walker concurred in the judgment and opinion.

**OPINION**

¶ 1     Respondent, A.J., appeals the trial court's termination of her parental rights. Her daughter, J.W., was born February 7, 2017, and is presently in foster care with foster parents who want to adopt her. It is stipulated by the parties that J.W.'s biological father is unknown. The trial court (1) found A.J. to be an unfit parent and (2) found it to be in the best interests of her daughter, J.W., to terminate A.J.'s parental rights. On appeal, respondent argues that the trial court erred in making the first finding that she was unfit. Since a court must find a parent

unfit before proceeding to a best-interests hearing, respondent argues that the second finding is unsupported, but she does not make separate arguments regarding the best-interests finding. As a result, it is the unfitness finding that is primarily at issue on this appeal.

¶ 2 In response, the Public Guardian argues: (1) that the trial court's unfitness finding was correct based on two of the three grounds found by the trial court, and (2) that we need not consider the third ground found by the trial court since a finding on any one ground is sufficient to sustain a finding of unfitness. The State, for its part, has adopted the Public Guardian's arguments. Thus, on appeal, the issue is whether the trial court's unfitness finding was against the manifest weight of the evidence, where it found unfitness based on the following two grounds: (1) that respondent did not make reasonable progress and efforts from October 6, 2021, to July 6, 2022, toward reunification with her child; and (2) that respondent failed to maintain a reasonable degree of concern or responsibility for the child's welfare. Since we conclude, for reasons explained below, that the trial court did not err in finding that respondent failed to make reasonable progress during the specified nine-month period and since one ground suffices, we do not consider the second ground.

¶ 3 With respect to the fairly limited issue now before us of progress during the specified nine-month period, respondent counters with primarily a legal argument. Although she concedes on appeal that it is "arguable" whether she made progress during this period, she argues that trial courts, as a general rule, should not consider only the designated nine-month period, but rather should consider all periods. For the reasons we explain below, we must reject this argument because adopting it would eliminate the nine-month time limitation clearly set forth in the statute. Thus, we affirm.

¶ 4                                      BACKGROUND

2

¶ 5        As noted above, in her reply brief, respondent concedes that, during the period from October 6, 2021, to July 6, 2022, she "arguably failed to make efforts or progress or visit her child or maintain contact with the agency." As noted, respondent rejoins with primarily a legal assertion that "all periods of time must be considered" in these cases and that it is error to consider just one nine-month period. Since the issue before us is largely a legal one, and since the facts are predominantly uncontested, we provide a summary of the facts presented at the unfitness hearing, which is the only finding at issue before us.

¶ 6        At the fitness hearing on September 21, 2023, Devin Dittrich, the Director of Programs at One Hope United, testified. His agency was assigned in September 2020 to provide services to the family through the present time. One Hope's service period included the nine-month period at issue, which was from October 6, 2021, to July 6, 2022. The initial assessment concluded that respondent was in need of various services, including substance abuse treatment, individual therapy and psychiatric services, and a nurturing parents program. Since respondent was homeless, the caseworker had difficulty getting in contact with her. However, referrals were placed for substance abuse assessment, as well as housing and employment advocacy. Referrals were not placed for other services, such as therapy and parenting, because the agency believed that respondent's substance abuse needed to be under control first for other services to be beneficial.

¶ 7        Dittrich testified that respondent completed the juvenile court substance abuse assessment (JCAP) and submitted to drug screens, but was ultimately discharged as unsuccessful. The treatment recommended was residential in-patient treatment and/or a methadone program, with random drug screens. However, respondent did not engage in any

substance abuse treatment between September 2020 and July 2022. The agency did not refer her for therapy because she could not demonstrate sobriety.

¶ 8        Dittrich testified that respondent visited regularly with her daughter, in visits supervised by the agency, from the onset of the case until August 11, 2021,[1] when an incident occurred in a park during a visit which led to termination. In this visit, respondent appeared to be under the influence and exhibited erratic behavior. In addition, respondent invited her boyfriend who, at the time, was believed to be the putative father, although later DNA testing disproved that assumption. Respondent invited him to the visit although that was not permitted. Subsequently, the child made an outcry of sexual abuse by him, and the sexual abuse services coordinator said that no visit should occur, because the child was being retraumatized during visitation.

¶ 9        Dittrich testified that, when visits were suspended, the agency made clear what needed to happen for visits to resume. First, respondent needed to work on her sobriety so that she could make better choices and so that visits would not be traumatic. Also, the child had to progress in her own individual therapy.

¶ 10        Dittrich testified that, after August 2021, there was limited contact. Then respondent reached out in April 2022 and, starting in June 2022, she started engaging more and having more contact with staff. The agency learned in April 2022 that respondent was incarcerated, and respondent remained incarcerated from April until July 2022. Prior to April 2022, respondent did not engage in any therapy services or in any other required services that would have been needed to reinstate visits. In August 2022, caseworker Bessie Miles took over from

---

[1] On later examination by the court, Ditrich clarified that the incident occurred on August 11, 2021, and that visits were suspended on August 12, 2021.

prior case worker Rachel Carr, and respondent became involved in some recommended services.

¶ 11        Dittrich testified that in June 2022, while respondent was incarcerated, she entered a program called "T.H.R.I.V.E." which Dittrich testified "help put her on the right path." When she was released, she entered drug treatment. Dittrich did not know what the acronym stood for, but he testified that it was a program through the Cook County Women's Detention Program that focused, in part, on parenting skills.

¶ 12        On cross-examination, Dittrich testified that the goal was changed in April 2022 from return home to termination of parental rights. Although respondent wanted visits, visits were not allowed due to respondent's need to participate in services, so she would not retraumatize the child. Early in the case, respondent had been referred to the Haymarket and Women's Treatment Center. In August 2022, respondent reached out on her own to Haymarket to engage in services at that time. Also in August 2022, a different supervisor took over the case from Dittrich.

¶ 13        Case worker Bessie Miles testified that her assignment to the case began in August 2022, which is after the designated nine-month period. Her assignment lasted one year, from August 2022 to August 2023. In August 2022, respondent entered in-patient care at Haymarket, where she received substance abuse treatment, as well as some other recommended services. However, respondent did not have any visits with the child, from when visits were suspended in August 2021 until at least August 2023, when Miles's assignment ended. In August 2022, when Miles was assigned, respondent asked for visits. Miles explained what needed to happen before visits could be resumed. First, the child was in therapy, and the

therapist did not deem it in the child's best interests to resume visits at that time. Also, the mother needed to engage in services, such as substance abuse treatment.

¶ 14    On cross, Miles testified that, at Haymarket, respondent completed both in-patient and out-patient services and some parenting classes. Respondent participated in all the programs at Sangamon House, which is a recovery home run by Haymarket. Respondent now currently works for Haymarket. Respondent's drug treatment included group and individual counseling. Miles testified that respondent had been fully compliant with all the programs, including four drug drops per month for the last year, which have all come back negative. In Miles's opinion, respondent is now sober. Throughout Miles's work on the case, respondent has asked to see her daughter. With respect to resuming visits, Miles testified that the child is currently engaged in trauma therapy and the therapist has not deemed it appropriate to resume visits or contact with the mother. Miles is not concerned that respondent would show up inebriated or high to a visit.

¶ 15    Respondent testified:

"Q. Is there anything in particular that you would like to tell the Court now with [*sic*] regarding your services?

A. I know I made a mistake, but other than that I am doing everything possible to get visitations with my daughter. I am not trying to disturb where she lives or anything. I just would like to have some type of contact with my child if possible. If your Honor sees fit. That's all I'm asking. That's all I can do is ask."

Respondent testified that she had been informed as recently as today that her daughter asks about her. When asked why she did not get involved with services until the goal had been changed to termination, respondent answered that she was "homeless and fully addicted."

Regarding the sexual abuse, she testified: "I would never do anything to hurt her as far as any sexual abuse. I only heard about that once she got into custody. They said she was displaying habits of children that have been sexually abused." Respondent testified that she was currently working in the housekeeping department of Haymarket, 40 hours per week, and going to school in the G.E.D. program at Malcolm X. College. She lives at St. Anne's, a recovery home for women, where she attends meetings several times a week, but she is looking to rent her own apartment.

¶ 16        After listening to arguments from counsel, the trial court found unfitness on several grounds, including that respondent did not make reasonable progress or efforts from October 6, 2021, to July 6, 2022, toward reunification with her child. During the best-interests hearing, the foster mother testified that she had "no problem" with respondent having supervised visits, subject to therapist approval. At the end of the subsequent best-interests hearing on September 21, 2023, the trial court found that it was in the best interests of the minor to terminate respondent's parental rights. On October 19, 2023, respondent filed a timely notice of appeal, and this appeal followed.

¶ 17                                ANALYSIS

¶ 18        On appeal, respondent challenges the finding that she is unfit as a parent. As respondent notes, the trial court's unfitness finding serves as the basis for any subsequent best-interests ruling. "The bifurcated nature of termination proceedings calls for the court to make a determination regarding the parent's fitness first, without considering the child's best interests or the likelihood of eventual adoption." *In re Tyianna J.*, 2017 IL App (1st) 162306, ¶ 89.

¶ 19                          I. Standard of Review

7

¶ 20          Since termination of parental rights constitutes a permanent and complete severance of the parent-child relationship, the State bears the burden in the trial court of establishing the parent's unfitness by clear and convincing evidence. *In re C.N.*, 196 Ill. 2d 181, 208 (2001). However, any one ground, if properly proven, is sufficient to support a finding of parental unfitness. *Tyianna J.*, 2017 IL App (1st) 162306, ¶ 88.

¶ 21          On review, the appellate court considers whether the trial court's "clear and convincing" finding was against the manifest weight of the evidence. *Tyianna J.*, 2017 IL App (1st) 162306, ¶ 88. Findings are against the manifest weight of the evidence when an opposite conclusion is clearly apparent from the record. *McAllister v. Illinois Workers' Compensation Comm'n*, 2020 IL 124848, ¶ 30. Although reviewing courts are reluctant to conclude that a determination is against the manifest weight of the evidence, we will not hesitate to do so when the clearly evident weight of the evidence compels an opposite conclusion. *McAllister*, 2020 IL 124848, ¶ 30.

¶ 22          "Decisions rendered in other cases are of limited assistance" in termination cases, as " '[e]ach case concerning parental unfitness is *sui generis*, unique unto itself.' " *Tyianna J.*, 2017 IL App (1st) 162306, ¶ 88 (quoting *In re Adoption of Syck*, 138 Ill. 2d 255, 279 (1990)). As a result, factual comparisons to other cases are of little value. *In re Nicholas C.*, 2017 IL App (1st) 162101, ¶ 25. See also *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 47 (" '[e]ach case concerning parental unfitness is *sui generis*, requiring close analysis of its individual facts; consequently, factual comparison to other cases by reviewing courts are of little value' "), quoting *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006)).

¶ 23          Respondent, who was born on August 14, 1978, argues that she completely turned her life around after entering a program in June 2022 called "T.H.R.I.V.E." which put her, in the

8

words of the supervisor of her case, "on the right path." After a long battle with drug addiction, respondent became sober. However, on April 13, 2022, prior to her enrollment in T.H.R.I.V.E., the permanency goal for her daughter had already been changed from "return home" to termination of parental rights, thereby foreclosing some agency referrals for services. As a result, respondent sought services on her own.

¶ 24 The State argues, in essence, that her efforts were too late and that the statutory grounds for unfitness were already established.

¶ 25                        II. Reasonable Progress and Efforts

¶ 26 " 'In Illinois, the authority to involuntarily terminate parental rights is purely statutory and the scope of the court's authority is defined by the Juvenile Court Act and the Adoption Act.' " *In re M.I. v. J.B.*, 2016 IL 120232, ¶ 19 (quoting *In re E.B.*, 231 Ill. 2d 459, 463 (2008)). The Adoption Act lists the possible statutory grounds for finding unfitness. 750 ILCS 50/1 (D) (West 2020) ("[t]he grounds of unfitness are any one or more of the following").

¶ 27 The first ground, found by the trial court and argued on appeal by the State and Public Guardian, is Ground M:

> "[f]ailure *** (i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child *** during any 9-month period following the adjudication of neglected *** minor *** or (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication." 750 ILCS 50/1(D)(m) (West 2020).

In the trial court, the two nine-month periods chosen by the State were: (1) October 6, 2021, to July 6, 2022; and (2) July 5, 2022, to April 5, 2023. However, the trial court made a finding

only as to the former period; and, on appeal, the Public Guardian and the State argue only the former period.

¶ 28      Our supreme court has noted that Ground M is phrased in the disjunctive, thereby providing "two independent bases for a finding of unfitness: (1) the failure to make reasonable efforts to correct the conditions that were the basis for the removal of the child, or (2) the failure to make reasonable progress toward the return of the child." *In re C.N.*, 196 Ill. 2d at 210-11.

¶ 29      Our supreme court has defined the word "progress" as used in the Act as " 'demonstrable movement toward the goal of reunification.' " *In re C.N.*, 196 Ill. 2d 181, 211 (2001) (quoting *In re J.A.*, 316 Ill. App. 3d 553, 565 (2000)). "Under the statute's express language, a parent's progress toward this goal is judged under the familiar 'reasonableness' standard." *C.N.*, 196 Ill. 2d at 211.[2] In considering whether reasonable progress has been made, a court may consider both progress with respect to correcting the original conditions and progress with respect to completing the service plan. See *C.N.*, 196 Ill. 2d at 213-14 (rejecting both the view that a court may look for progress only in correcting the original situation and the view that a court may look only to compliance with a service plan).

¶ 30      With respect to a service plan, Ground M provides, in relevant part, that "[i]f a service plan has been established *** and if those services were available, then, for purposes of the Act, 'failure to make reasonable progress ***' includes the parent's failure to substantially fulfill his or her obligations under the service plan." 750 ILCS 50/1(D)(m) (West 2020). Per the express words of the statute, a parent's fulfillment is contingent on the availability of

_____

[2] Respondent argues in her brief that the State failed in its burden to show that she made "no" progress or efforts. However, that is not the standard. The question was whether her progress and efforts were reasonable under the circumstances.

services, and the issue is whether she substantially fulfilled her obligations under the plan. 750 ILCS 50/1(D)(m) (West 2020).

¶ 31    As noted, the period found by the trial court was October 6, 2021, to July 6, 2022. The minor entered protective custody on September 11, 2020, and temporary custody was granted to the Department of Children and Family Services on September 15, 2020. Respondent's principal obstacle to reunification was substance abuse. In November 2020, the agency recommended several services that it did not make referrals for, because the services would not be beneficial until respondent successfully completed a drug treatment program and achieved sobriety. On April 13, 2022, the permanency goal was changed to termination of parental rights. In April 2022, respondent was incarcerated, and in June 2022, she entered the program run by the Corrections Department which put her on the right path. In July 2022, after her release from jail, respondent started a drug treatment program. In August 2022, she sought services on her own, since the agency recommendation had changed to termination of rights. Her caseworker testified that respondent is now sober. The caseworker testified that respondent had been completing at least four drug drops per month during the year prior to the September 21, 2023, fitness hearing, that all drops came back negative for drugs, and that the caseworker had no concerns that respondent was going to show up inebriated or high.

¶ 32    In its brief to this court, respondent argues: "The uncontradicted evidence at trial establishes that [respondent] began her journey towards the goal of sustained sobriety towards the end of the [State's] designated first period, that is in June and July of 2022[.]" Respondent argues that her late efforts in the nine month period were proved to be " 'demonstrable movement toward the goal of reunification' " (*In re C.N.*, 196 Ill. 2d at 211), as shown by the

fact of her sustained progress and efforts after and continuing up to the time of the termination hearing.

¶ 33    Respondent argues that the trial court erred in finding her "late efforts and uncompleted progress" in this earlier period were conclusive on the issue of her fitness, in light of her *following* substantial efforts and progress prior to the termination hearing. In support of this argument, respondent quoted Justice Freeman's concurrence in *In re D.F.*, 208 Ill. 2d 223, 247-48 (2003). We provide below the entire quote that respondent set forth in her brief. Justice Freeman wrote that it was:

> "the legislature's intention that the Adoption Act be amended to allow the courts to consider evidence of reasonable progress made by the parent during any nine-month period between the adjudication of neglect and the date of the termination hearing. The legislature wanted to protect the parent who failed to make progress during the initial nine-month period following the adjudication of neglect, but made reasonable progress during any subsequent nine-month period. At the same time, the legislature wanted to protect the child whose parent made progress during the initial nine-month period but reverted to negative behavior in any subsequent nine-month period." *In re D.F.*, 208 Ill. 2d at 247-48.[3]

¶ 34    Whether or not we agree with Justice Freeman is not the issue. Unfortunately for respondent, his was a minority position, rejected by the majority in that case. The majority in *In re D.F.*, 208 Ill. 2d at 235, found that "the legislative history of [Ground M] indicates the legislature's ongoing desire to *shorten* the period of time during which a parent must make

_____

[3] Based on the above quote, respondent argues that the trial court erred by ignoring "the statute's intent that all designated 9-month periods be evaluated for evidence of reasonable efforts or progress."

reasonable efforts and progress or be deemed unfit." The majority observed that at first the statute specified a 24-month period, then a 12-month period and finally a 9-month period. *In re D.F.*, 208 Ill. 2d at 233. In addition, the majority noted that the legislature's express statement about how the statute should be construed supported expedition. *In re D.F.*, 208 Ill. 2d at 232. The section of the Act entitled "Construction of Act" states, in relevant part, "that this Act" should "be construed and interpreted so as not to result in extending time limits beyond those set forth herein." 750 ILCS 50/20a (West 2020). The majority concluded that the legislature did not intend an "open-ended, and essentially *unlimited* period of time." (Emphasis in original.) *In re D.F.*, 208 Ill. 2d at 232. Similarly, in the case at bar, respondent's argument that the trial court erred by not considering the subsequent nine months would transform the statutory time limit into an open-ended, and essentially unlimited period of time.

¶ 35 While we are impressed by respondent's achievement in turning her life around and achieving sobriety after a difficult battle with addiction, we cannot find that the trial court's finding about a lack of reasonable progress toward reunification during the nine-month period ending on July 6, 2022, was against the manifest weight of the evidence. Since only one ground suffices, we do not consider the other grounds.

¶ 36                                                    CONCLUSION

¶ 37 For the foregoing reasons, we must affirm. There is no question that the record amply supports the trial court's finding of a lack of reasonable progress toward reunification during the nine-month period ending on July 6, 2022. Nonetheless, we respect respondent's recent triumphs and applaud the foster mother's willingness to consider appropriate contact.

¶ 38 Affirmed.