**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 250038-U

Order filed June 9, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| *In re* G.D., | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| a Minor | ) | Will County, Illinois, |
| | ) | |
| (People of the State of Illinois, | ) | |
| | ) | Appeal No. 3-25-0038 |
| Petitioner-Appellee, | ) | Circuit No. 22-JA-108 |
| | ) | |
| v. | ) | |
| | ) | |
| Tamika W., | ) | Honorable |
| | ) | Carmen Goodman, |
| Respondent-Appellant). | ) | Judge, Presiding. |

_____

JUSTICE HETTEL delivered the judgment of the court.
Justices Davenport and Peterson concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*: The trial court's finding that mother was unfit for failing to make reasonable progress toward the return of her child was not against the manifest weight of the evidence.

¶ 2    Respondent, Tamika W., appeals from the trial court's order finding her unfit and terminating her parental rights to her son, G.D. She contends the court's finding that she was an

unfit parent pursuant to section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2022)) was against the manifest weight of the evidence. We affirm.

¶ 3                                                    I. BACKGROUND

¶ 4            On July 1, 2022, when G.D. was three days old, the State filed a petition against respondent Tamika W. alleging that G.D. was neglected in that his environment was injurious to his welfare because (1) respondent and G.D.'s father had a history of domestic violence, (2) respondent had been found dispositionally unfit in another juvenile petition involving G.D.'s one-year-old brother, and (3) respondent still had services to complete to be restored to fitness. The State requested that G.D. be made a ward of the court.

¶ 5            The circuit court conducted a shelter care hearing on July 11, 2022, at which respondent stipulated that there was probable cause to believe G.D. was neglected due to an injurious environment. The court placed G.D. in the temporary custody of the Department of Children and Family Services (DCFS) with the right to place and advised respondent that she needed to cooperate with DCFS, comply with the terms of the service plan, and correct the conditions which required G.D. to be in care, or risk termination of her parental rights.

¶ 6            On October 11, 2022, following an adjudicatory hearing, the court found G.D. neglected in that his environment was injurious to his welfare. The factual basis for the court's finding as it relates to respondent was the dispositional order entered in the sibling's case and the testimony of the caseworker that respondent had services yet to complete within her service plan.

¶ 7            The court held a dispositional hearing on November 29, 2022. The State submitted the caseworker's report and service plan as evidence. The report provided that prior to G.D.'s birth there had been three investigations involving domestic violence in which G.D.'s older sibling was present. The incidents reportedly occurred after one or both parents had been drinking. Respondent

2

was only 20 years old at the time and not old enough to consume alcohol. The report also revealed that respondent had been arrested in September 2021 for domestic battery against the father. The service plan required respondent to participate in an integrated assessment, complete parenting education and coaching classes, abstain from substance and alcohol use, submit to random drug testing, complete a psychotherapy evaluation, and participate in domestic violence services for perpetrators.

¶ 8 At the close of the hearing, the trial court found that respondent had not completed her service tasks. Accordingly, the court entered a dispositional order finding her unfit. At subsequent permanency review hearings, the court found that respondent had not made reasonable efforts or progress towards the goal of return home.

¶ 9 On June 5, 2024, the State filed a motion to terminate respondent's parental rights The motion alleged that respondent was unfit in that she (1) "failed to maintain a reasonable degree of interest, concern and responsibility as to [G.D's] welfare, pursuant to 750 ILCS 50/1D(b);" (2) "failed to make reasonable efforts to correct the conditions which were the basis for the removal of [G.D.], pursuant to 750 ILCS 50/1D(m)(i);" (3) "failed to make reasonable progress towards the return of [G.D.] *** within 9 months after an adjudication of neglected or abused minor Child under Section 2-3 of the Juvenile Court Act, 1987, or dependent minor under Section 2-4 of that Act, pursuant to 750 ILCS 50/1D(m)(ii) from October 11, 2022 through July 11, 2023;" and (4) "failed to make reasonable progress towards the return of [G.D.] *** within 9 months after an adjudication of neglected or abused minor Child under Section 2-3 of the Juvenile Court Act, 1987, or dependent minor under Section 2-4 of that Act, pursuant to 750 ILCS 50/1D(m)(ii) from July 12, 2023 through April 12, 2024."

¶ 10       At the termination hearing conducted on January 14, 2025, Natalie Bauer testified that she was a program manager at Lutheran Child and Family Services (LCFS) and was assigned as the supervisor in G.D.'s case shortly after he was born. She testified that G.D. was taken into DCFS care in July 2022 because his brother was in DCFS care and his brother's case had not progressed beyond supervised visitation when G.D. was born.

¶ 11       Bauer supervised G.D.'s case for the nine-month period of October 11, 2022, through July 11, 2023. She was also the caseworker assigned to the case in the spring of 2024 because her co-worker was on parental leave. Bauer testified that due to G.D.'s sibling's case a service plan was already in place as of October 11, 2022. Among other things, the plan required respondent to complete substance abuse treatment and remain sober, complete domestic violence classes for victims and perpetrators, and participate in visitation with G.D. LCFS monitored sobriety through random drug drops. Bauer testified that she discussed these services with respondent and made referrals to assist her in completion.

¶ 12       According to Bauer's records, respondent completed the integrated assessment but still needed to demonstrate that she had maintained sobriety through the random drug drops. Respondent was notified of drug drops through text messages. However she did not submit to any random drops in the nine-month period from October 11, 2022, through July 11, 2023, completing her last drop in June 2022.

¶ 13       Bauer testified that respondent moved to Wisconsin shortly after G.D. was removed from her care. She moved back to Illinois at the end of December 2022. Respondent had minimal contact with LCFS when she was in Wisconsin and did not update her address for her Wisconsin location. While respondent was living out-of-state, her caseworker had difficulty contacting her because she changed her phone number frequently and did not always maintain a valid phone number.

4

¶ 14      Bauer testified that she was unable to schedule individual therapy for respondent when she was in Wisconsin. When respondent returned, Bauer scheduled a mental health assessment for respondent on January 10, 2023, but respondent did not attend the appointment. Respondent did complete domestic violence victim services but did not finish the perpetrator portion of those services, attending only a few sessions in March and April 2023 and then never re-engaging in the program.

¶ 15      As of July 11, 2023, Bauer testified that respondent still needed to complete mental health therapy, domestic violence services for perpetrators, random drug drops, and visitation. Her visits with G.D. between October 11, 2022, and July 11, 2023, were "very sporadic." Bauer scheduled weekly visits, but respondent failed to attend most of them. Most months, respondent failed to attend any visits or only attended one. Bauer noted that, in all, 82 visits were scheduled between October 11, 2022, and April 12, 2024, and respondent only attended 8.

¶ 16      The second nine-month period was July 12, 2023, through April 12, 2024. Bauer was the case supervisor or assigned as the caseworker through October 2023. Around July 10, 2023, Bauer contacted respondent by text message about having a child and family team meeting; respondent did not answer the text. Bauer attempted to reach her after that, but the number no longer worked. After reaching out to respondent's attorney for a new number, Bauer attempted to reach her again but received no response. Between July 12, 2023, and April 12, 2024, respondent's mental health referral remained valid yet respondent did not make an appointment. Concerning her random drug drops, Bauer testified that respondent did not submit any during the second nine-month period. She also moved back to Wisconsin during that time, where it was difficult to schedule her for drops. She was sent for one drop and missed it. She did not engage in any domestic violence perpetrator services in the second nine-month period.

¶ 17        Bauer testified that a new caseworker was assigned to the case in August 2023, who reported having a "very difficult time" contacting respondent. Around February 2024, respondent's phone number changed but she did not inform her caseworker or the agency. LCFS did not find out respondent was back in Illinois until April 2024. Bauer's records showed that respondent had no visits with G.D. during the second nine-month period. Her last visit with her son was on June 28, 2023. In July 2023, a caseworker aide contacted respondent to schedule a visit, and respondent stated that she had COVID. On August 1, 2023, she reached out to respondent again but did not hear back from her. Respondent did not provide her address in Wisconsin even though the caseworker asked for it.

¶ 18        Bauer stated that she attempted to initiate an interstate compact for respondent's drug drops when respondent was in Wisconsin the first time. Respondent returned to Illinois before she could do so. Respondent's caseworker scheduled a drop in January 2023, but respondent did not go.

¶ 19        Bauer further testified that respondent's grandmother helped her with transportation to and from visits with G.D. LCFS gave respondent gas cards to help with travel expenses. When respondent lived in Wisconsin, she indicated that she would still be able to attend visits. During the period when Bauer was the assigned supervisor, respondent never told her that she was having difficulty getting to visits.

¶ 20        Margaret Menzies testified that she took over from Bauer as the case supervisor in October 2023, after Bauer was promoted to program manager. Menzies attempted to reach respondent five times between October 2023 and April 2024, to no avail. She talked to her once on the phone on April 10, 2024. Respondent did not engage in any outstanding services between October 15, 2023, and April 12, 2024, nor did she contact the agency about G.D.'s well-being. Menzies testified that, as far as she was aware, respondent's last visit with G.D. was before she took over the case.

Menzies had no contact with respondent until two days before the second nine-month period ended.

¶ 21    Respondent testified that, at the time of the hearing, she was 23 years old. She grew up with her grandparents in Crete, Illinois, and moved to Milwaukee, Wisconsin in the fall of 2022 to "flee from my kids' father who was abusive towards me." She had an order of protection against the father but then she "stopped it" because she thought they "could work it out." She only lived in Wisconsin for "a couple of weeks" the first time. She moved back to Wisconsin again in early 2023 and returned to Illinois around June 2023.

¶ 22    Respondent admitted that she did not have contact with the agency when she moved to Wisconsin. Her caseworker told her that it would be hard to attend visits if she was living in another state, and respondent did not inquire further about the possibility of arranging out-of-state visits. Respondent testified that she let the agency know when she moved back to Illinois the first time. She missed a drop when she moved back because she did not have transportation. She thought she updated the agency with her phone number one time. She did not update her caseworker with her new number when she got back to Illinois the second time because no one answered the phone the day she called the agency.

¶ 23    Respondent stated that when she lived in Wisconsin the second time she had two jobs and was financially stable. She would like to visit G.D. more, complete domestic violence services, attend counseling, and participate in random drops. She testified that as of the date of the hearing she finally had her life "back on track" and was ready to complete the services she needed to complete to regain custody of G.D. Respondent acknowledged that she had not visited G.D. for more than a year. She stopped participating in services the first time she moved to Wisconsin and had yet to re-engage in any services even though she knew they needed to be completed.

7

¶ 24    The trial court entered an order finding respondent unfit by clear and convincing evidence based on all four grounds set forth in the State's motion to terminate. Thereafter, the court held a best-interest hearing and determined it was in G.D.'s best interest to terminate respondent's parental rights.

¶ 25                                                    II. ANALYSIS

¶ 26    On appeal, respondent only challenges the court's finding that she was unfit because she failed to make reasonable progress toward the return of G.D. Respondent argues that the State failed to prove that she was unfit by clear and convincing evidence because the evidence showed that she had completed her integrated assessment and some services and merely needed more time to comply with her service plan.

¶ 27    The involuntary termination of parental rights is governed by the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2022)) and the Adoption Act (750 ILCS 50/1 *et seq.* (West 2022)). *In re D.F.*, 201 Ill. 2d 476, 494 (2002). It involves a two-step process. *Id.* First, the State must prove by clear and convincing evidence that a respondent is an "unfit" parent, as that term is defined in section 1(D) of the Adoption Act. See 750 ILCS 50/1(D) (West 2022); see also *In re D.F.*, 201 Ill. 2d at 494-95. Second, if the court makes such a finding, it must determine if it is in the best interests of the child that parental rights be terminated. *In re D.F.*, 201 Ill. 2d at 495.

¶ 28    Although the State may rely on several grounds in its petition, a finding of unfitness on any one ground under section 1(D) is sufficient to the termination of parental rights. *In re C.W.*, 199 Ill. 2d 198, 217 (2002). In this case, the circuit court found respondent unfit under all four grounds alleged in the State's petition. On review, however, any one ground will suffice, and we need not consider whether the additional grounds were proven. See *In re J.W.*, 2024 IL App (1st) 231918,

8

¶ 35. We therefore focus our analysis on the court's unfitness determination under section 1(D)(m)(ii) during the second nine-month period, as we find it dispositive.

¶ 29 Under section 1(D)(m)(ii) of the Adoption Act, a parent may be found unfit when there is a "[f]ailure by a parent *** to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987 or dependent minor under Section 2-4 of that Act." 750 ILCS 50/1(D)(m)(ii) (West 2022). Section 1(D)(m)(ii) further provides:

"If a service plan has been established *** to correct the conditions that were the basis for the removal of the child from the parent and if those services were available, then, for purposes of this Act, 'failure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care during any 9-month period following the adjudication under Section 2-3 or 2-4 of the Juvenile Court Act of 1987." *Id.*

¶ 30 Whether a parent has made reasonable progress "is judged by an objective standard based upon the amount of progress measured from the conditions existing at the time custody was taken from the parent." *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). "At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification." *Id*. "Reasonable progress exists when the trial court can conclude that it will be able to order the child returned to parental custody in the near future." *Id*. A parent's failure to complete recommended services supports a finding that the parent failed to make reasonable progress. See *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 53.

¶ 31　　　　We afford great deference to a trial court's finding of unfitness because the trial court is in the best position to view and evaluate the parties and their testimony. *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 46. As a result, we will not reverse a trial court's finding of unfitness unless it was against the manifest weight of the evidence. *Id.* A decision is against the manifest weight of the evidence where the opposite result is clearly evident. *Id.*

¶ 32　　　　Here, Bauer and Menzies, the supervisors during the second nine-month period (July 12, 2023, and April 12, 2024), testified to the services respondent needed to complete. Those services included an integrated assessment evaluation, domestic violence services for victims and perpetrators, substance abuse treatment with coordinating random drug drops, a psychotherapy assessment, and visitation with G.D. Although respondent completed her integrated assessment and domestic violence services for victims, she failed to complete the other conditions of her service plan. She did not engage in domestic violence services for perpetrators, and she missed the only random drug drop the agency was able to schedule. Moreover, the mental health referral remained valid during the second nine-month period, but respondent did not follow up with an appointment. Further, respondent had no visits with G.D. Between July 12, 2023, and April 12, 2024, Bauer and Menzies testified that respondent could have availed herself of four visits each month with her son, but she failed to visit G.D. even once. Respondent's unwillingness to engage in services, particularly the random drug drops and domestic violence perpetrator classes, is especially concerning given the substance abuse and domestic violence issues that brought G.D. into DCFS care.

¶ 33　　　　Respondent contends that the trial court's finding was against the manifest weight of the evidence because by January 2025 she had turned her life around and simply needed "a little more time" to complete her services. "Ultimately, the trial court's ability to return the child[ ] to a

10

parent's care in the near future is the lodestar of whether a parent has made reasonable progress." *In re Ta. T.*, 2021 IL App (4th) 200658, ¶ 55. "[W]hen the State is able to prove, by clear and convincing evidence, that the court will not be able to return the child home in the near future, despite ample time and opportunity for compliance with the court's directives, then a finding of unfitness is appropriate." *Id.*

¶ 34 In this case, respondent's completion of a few initial assessments and some parenting classes during the relevant nine-month period did not constitute reasonable progress toward the goal of returning G.D. to her care. Based on the evidence presented, the trial court's determination that respondent was unfit was not against the manifest weight of the evidence.

¶ 35 III. CONCLUSION

¶ 36 The judgment of the circuit court of Will County is affirmed.

¶ 37 Affirmed.