2025 IL App (1st) 250228

No. 1-25-0228

Opinion filed September 9, 2025

Second Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | |
|---|---|
| *In re* Z.S., a Minor, | ) |
| | ) Appeal from the |
| (The People of the State of Illinois, | ) Circuit Court of |
| | ) Cook County. |
| Petitioner-Appellee, | ) |
| | ) |
| v. | ) No. 20 JA 166 |
| | ) |
| Y.R., | ) Honorable |
| | ) Debjani D. Desai, |
| Respondent-Appellant). | ) Judge, presiding. |

_____

PRESIDING JUSTICE VAN TINE delivered the judgment of the court, with opinion.
Justices McBride and Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1     Respondent Y.R. appeals from the trial court's termination of her parental rights.

Respondent contends that the trial court's unfitness and best interests findings were against the

manifest weight of the evidence. For the following reasons, we affirm.

¶ 2                              I. BACKGROUND

¶ 3                        A. Pretermination Hearing Proceedings

¶ 4  Respondent Y.R. gave birth to Z.S. on July 8, 2017. He is currently eight years old. Z.S.'s father is R.S. The trial court entered a default judgment against R.S. and terminated his parental rights. He is not a party to this appeal.

¶ 5  On January 27, 2020, the State filed a petition for adjudication of wardship and a motion for temporary custody of Z.S. The State alleged that respondent had two other children in Department of Children and Family Services (DCFS) custody with findings of abuse or neglect and that she had not completed services in those cases. In addition, the State alleged that police responded to an incident on December 14, 2019, in which R.S. was intoxicated and locked respondent and Z.S. out of their house. Later that day, R.S. brought Z.S. to a hospital and claimed that respondent had been using illegal drugs. The trial court found probable cause that Z.S. was abused or neglected, removed him from his parents' home, and granted DCFS temporary custody with the right to place him. On September 9, 2021, the court adjudicated Z.S. neglected due to an injurious environment. On November 3, 2021, the court made Z.S. a ward of the court.

¶ 6  On March 14, 2024, at DCFS's request, the court changed the permanency goal to substitute care pending court determination on termination of parental rights "[d]ue to the length of time this case ha[d] been open and due to the history and nature of this case coupled with [respondent's] behaviors in and out of court."

¶ 7  On June 14, 2024, the State filed a petition seeking termination of respondent's parental rights. Relevant here, the State alleged that respondent was unfit under section 1(D)(b) and (D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(b), (m)(ii) (West 2020)) because she failed to maintain a reasonable degree of interest, concern, or responsibility as to Z.S.'s welfare and failed to make reasonable progress toward Z.S.'s return home. With respect to section 1(D)(m)(ii), the

State alleged that respondent failed to make reasonable progress during the following nine-month periods: September 9, 2021, to June 9, 2022; June 9, 2022, to March 9, 2023; March 9, 2023, to December 9, 2023; December 9, 2023, to September 9, 2024; and January 8, 2024, to October 8, 2024. The State also alleged that Z.S.'s adoption by his foster parents was in his best interest because he had been in their care since December 17, 2020.

¶ 8                                    B. Unfitness Hearing

¶ 9       The trial court held an unfitness hearing on October 29, 2024, and November 22, 2024.

¶ 10                              1. Krystle Miller and Eleena Olaleye

¶ 11      DCFS child welfare specialist Krystle Miller testified that Z.S. entered DCFS care in 2020 due to concerns about domestic violence and substance abuse in his parents' home. DCFS initially placed Z.S. with his uncle. In December 2020, Z.S. was at respondent's home unsupervised and "was found wandering alone at a park without shoes on and had crossed a busy street to get there." As a result, respondent was charged with and pled guilty to child endangerment. A certified statement of disposition entered into evidence reflects that respondent was arrested on December 17, 2020, and charged with child endangerment (720 ILCS 5/12C-5(a)(1) (West 2020)). On February 23, 2021, she was sentenced to 18 months of conditional discharge. DCFS placed Z.S. in a two-parent foster home, which remained his placement at the time of termination proceedings.

¶ 12      Miller's first assignment to this case began in January 2022. At that time, respondent had completed parent education, domestic violence services, and substance abuse services. She was engaged in individual therapy and psychiatric services. Respondent initially had supervised daytime visits with Z.S., which progressed to unsupervised daytime visits in July 2022. However, she never progressed to overnight visits due to inadequate housing. In the spring of 2022, Miller

told respondent that she had to inform DCFS if she was involved in a romantic relationship so DCFS could assess whether Z.S. could be around respondent's significant other. Miller's first assignment to this case concluded at the end of 2022.

¶ 13    DCFS investigator Eleena Olaleye was assigned to this case in January 2023. She testified that respondent was engaged in medication monitoring and psychiatric services through the University of Illinois-Chicago and individual therapy through Catholic Charities of Chicago. Respondent completed an assessment through the Cook County Juvenile Court Clinic (CCJCC), which indicated that she was not taking her psychiatric medication at times. The CCJCC assessment also stated that respondent's visits with Z.S. went well; she had "a good strategy to elicit [Z.S.'s] compliance and asked age-appropriate questions."

¶ 14    Respondent was "livid" when she learned that Z.S. had to repeat kindergarten. She blamed the foster parents and claimed that they were "not teaching him anything." Respondent was more focused on the foster parents than her own services.

¶ 15    In July 2023, respondent told Olaleye that her boyfriend, a man with the last name Herrera, died of a drug overdose in her apartment on July 2, 2023.[1] Neither respondent nor Z.S. were in the apartment when Herrera died, but respondent was having unsupervised visits with Z.S. at that apartment in July 2023. Prior to Herrera's death, respondent never told DCFS or her therapist that she had a boyfriend. Due to Herrera's death, respondent's visits with Z.S. changed from unsupervised to supervised. Thereafter, she never returned to unsupervised visitation.

_____

[1]Some exhibits in the record spell his last name "Barrera." It is not clear which spelling is correct. We will use the spelling the parties used in court during termination proceedings, which is "Herrera."

¶ 16    Also in the summer of 2023, Olaleye created a group text between herself, respondent, and Z.S.'s foster parents because the foster parents expressed concerns about respondent threatening them. In that group text, respondent accused Z.S.'s foster parents of not properly caring for him and "trying to steal" him. Olaleye advised respondent that those texts did not help her efforts to reunite with Z.S.

¶ 17    A CCJCC assessment dated September 15, 2023, was entered into evidence. The assessment reflects that clinical psychologist Dr. Phillip O'Donnell reviewed DCFS's case file, which included service plans, records from respondent's service providers, and Z.S.'s medical and educational records. He also interviewed respondent, Olaleye, respondent's therapist Shanna Arceo, and the foster parents. Based on his review of the records and his interviews, Dr. O'Donnell opined that there was "a low likelihood that [respondent] would be able to make the gains necessary to achieve a return home goal" and that achieving Z.S.'s return home would take at least one more year. Dr. O'Donnell acknowledged that termination of respondent's parental rights could "temporarily cause [Z.S.] anxiety and worry, as [foster mother E.B.] reported occurred when unsupervised visits were recently suspended," but Z.S.'s foster parents and his individual therapist could manage those concerns.

¶ 18    In late October or early November 2023, respondent sent threatening texts to the foster mother, E.B. The State moved a screenshot of these text messages into evidence. We set out these text messages as they appear in the record, with no corrections of typographical errors or omissions of inappropriate language. See *A.A. v. Nita A.*, 2023 IL App (1st) 230011, ¶ 5 n.2. Respondent sent E.B. the following texts, all in succession without responses from E.B.:

"[E.B.] I can't you miss treated my son girl you bad I beat your ass"

"I promise I'm going to the court system on Monday"

"You better move I gonna find you [E.B.] you did son bitch you fucked"

"I'm telling bitch you better fucken move I'm send all find you and family bitch"

"Gall GA Bitch they save ass you wrong bitch"

"That's my son"

"I'm taking my medicine keep calm"

Based on these text messages, Olaleye was concerned that respondent's behavior was becoming more erratic. Olaleye's assignment to this case ended in December 2023. She concluded that respondent "was not in a position to be full-time parenting unsupervised."

¶ 19    Miller was assigned to this case again in January 2024. She interviewed respondent regarding Herrera's death. Respondent claimed that Herrera was "not someone *** of significance" and that she was just "getting to know him" when he died. However, respondent acknowledged that she established a Go Fund Me account, in which she claimed to be Herrera's fiancée, to raise money for his family.

¶ 20    Respondent also told Miller that she sent Z.S.'s foster parents threatening text messages in the fall of 2023 because she believed the foster parents were not caring for Z.S. properly. Miller had no concerns that Z.S.'s foster parents were mistreating him. Miller concluded that respondent was more focused on the foster parents then her own reunification with Z.S., and her interactions with the foster parents evidenced her inability to regulate her emotions and behavior, which prevented Z.S.'s return home. However, in 2024, respondent apologized to the foster parents for threatening them and their relationship has improved.

¶ 21 Also in early 2024, Miller learned that respondent made comments to Z.S. "about what would happen when he was returned to her care." Miller advised respondent that such comments were inappropriate because it was uncertain whether Z.S. would in fact return to respondent's care and such statements confused him.

¶ 22 On March 14, 2024, DCFS changed the permanency goal from return home to court determination on termination of parental rights. Miller's March 2024 permanency report recommending this goal change was entered into evidence. The report stated that respondent was making some, but not satisfactory, progress toward reunification with Z.S. Respondent had completed domestic violence services, substance abuse treatment, and parent education. She was negative for drugs and alcohol at all the tests she attended, but she missed three tests in the six months prior to the report, which DCFS treated as positive tests. Respondent's unsupervised visits with Z.S. ended on July 29, 2023, due to her boyfriend's death. Z.S. was happy after visits with respondent, and they showed love and affection to each other during visits. Miller recommended "termination of parental rights" because of respondent's (1) missed drug and alcohol tests, (2) IQ in the "borderline impaired range" that made it difficult for her to exercise judgment, (3) threats toward the foster parents and difficulty coping with stress, and (4) romantic partners that put Z.S. at risk. However, Miller concluded that termination of parental rights was appropriate only if Z.S.'s contact with respondent continued.

¶ 23 Following the permanency goal change, Miller advised respondent to engage in community-based services and provide documentation of her psychiatric care. Respondent did neither. DCFS offered respondent weekly visitation with Z.S., but her visits were inconsistent. She missed visits in September 2024 and did not participate in makeup visits. In October 2024,

respondent missed a visit because she had an eye infection, and she did not accept DCFS's offer of a virtual visit. Respondent also canceled a visit in October 2024 because she and her older sons were going to Six Flags. Respondent ended her final visit with Z.S. before the termination trial 45 minutes early, claiming that Z.S. "expressed he was ready to go." In total, respondent attended four or five visits with Z.S. out of seven or eight that DCFS made available in September and October 2024.

¶ 24    As of late October 2024, respondent was engaged in individual therapy and family therapy with Z.S., but Miller did not know whether she was in psychiatric treatment. Miller concluded that Z.S. could not return to respondent's care due to her failure to make substantial progress, especially her failure to progress to overnight visitation, and concerns about her judgment and decision-making.

¶ 25                              2. Shanna Arceo

¶ 26    Shanna Arceo testified that she was a therapist and licensed clinical social worker at Catholic Charities of Chicago. She provided trauma-focused and relational therapy to respondent. Between September 2021 and January 2022, respondent missed 10 therapy sessions and did not communicate with Arceo because she was in jail. Upon her release from jail in January 2022, respondent did not take her psychotropic medication and made strange phone calls to Arceo. Respondent also abused substances from January through August 2022. As a result, Arceo moved respondent's therapy discharge date from December 2022 to June 2023, and then again to August 2023.

¶ 27    In the summer of 2023, respondent informed Arceo that "a friend" had died in her home. Respondent had not told Arceo that she was in a romantic relationship with that "friend," which

would have been a safety concern given respondent's history of domestic violence in relationships. Throughout the summer of 2023, respondent's therapy sessions focused on her grief due to Herrera's death and her concerns about Z.S.'s foster parents rather than Z.S.'s return home. On July 20, 2023, Arceo informed respondent that her visitation with Z.S. would change from unsupervised to supervised, and respondent "appeared to be in a panic and not understanding how her decision would impact her son." During a phone call with respondent's attorney on July 24, 2023, Arceo expressed concerns about respondent's judgment and irrational thoughts. The following day, respondent said "she was upset because no one [was] on her side and everyone was working against her."

¶ 28    Respondent continued to fixate on the foster parents in therapy sessions from July through November 2023. She believed the foster parents were "working to try to prevent her from spending time with" Z.S. and that Z.S.'s foster mother "was out to get her and take her son." Respondent was not receptive to Arceo's efforts to rationalize such thoughts. Arceo increased the frequency of therapy sessions due to respondent's anxiety, stress, and depression. In December 2023, respondent disrupted a child and family team meeting to talk about the foster parents and refused to discuss her reunification services. The meeting had to end due to respondent's disruptiveness. However, respondent's fixation on the foster parents improved thereafter.

¶ 29    Respondent's therapy sessions with Arceo ended on May 29, 2024. Overall, respondent made progress in that she voluntarily enrolled in drug classes, secured housing and employment, attended drug testing, and improved her anger and tone of voice in interactions with others.

¶ 30    Arceo's reports of her therapy sessions with respondent were entered into evidence. These reports reflect that Arceo diagnosed respondent with post-traumatic stress disorder. Reports from

April through June 2023 reflect that respondent was making moderate to positive progress toward Z.S.'s return home, but she was often anxious about this case and her relationship with the foster parents.

¶ 31                                    3. E.B.

¶ 32    E.B. is Z.S.'s foster mother. She testified that Z.S. came to live with her and her husband J.B. on December 17, 2020.

¶ 33    When E.B. picked up Z.S. from an unsupervised visit with respondent on April 1, 2023, Z.S. said that "a loud man" was at the visit. Z.S. said that the man was not his older brother Julian; it was a man who had been "mean to [respondent] sometimes, but he's funny." That night, E.B. texted respondent to ask about the man, and respondent "got really angry and came back with some angry texts about [E.B.] accusing [respondent] of doing things." Z.S. later identified the "loud man" as respondent's boyfriend, Herrera.

¶ 34    Also in April 2023, Z.S. said that respondent told him he would return to her home soon. That made Z.S. anxious because he thought he might be moving to Z.S.'s home the next day or week. Respondent told Z.S. not to tell his foster parents she said he would be coming home soon. Z.S. also told E.B. that he sat on respondent's lap without a seatbelt in the back seat of a car belonging to someone he did not know.

¶ 35    In June 2023, respondent texted E.B. and J.B. that she was upset because she saw a crack in Z.S.'s toenail. She accused E.B. and J.B. of not taking care of Z.S. and "taking in foster kids for the money." In August 2023, respondent failed to attend a visit with Z.S., so E.B. checked on respondent at her home. Respondent's front door was open, and one of her windows was broken.

Respondent explained that she was moving out because someone had broken into her apartment that day.

¶ 36    In October 2023, respondent texted E.B. at midnight and accused her of hurting Z.S. The text message also said, "I'm coming after you, bitch. You better move. I'm coming after your family," and threatened to beat E.B. E.B. reported this text to police and installed a home security system. Respondent apologized for this text in March 2024. Thereafter, her relationship with E.B. improved.

¶ 37    Z.S. was angry when he returned from a visit with respondent on October 21, 2023. He told E.B., "[Y]ou are not my real parents. My mom says I'm coming home soon, and I will never see you again and you are hurting her and I hate you because you're hurting her." In December 2023, Z.S. said that respondent suggested it was his fault he entered DCFS custody. E.B. explained to Z.S. that was untrue.

¶ 38    Respondent canceled a visit with Z.S. on October 5, 2024, and did not accept E.B.'s offer of a makeup visit. Respondent also canceled a visit on October 19, 2024, because she was taking her older sons to Six Flags, and she did not accept E.B.'s offer of a makeup visit for that date either. Aside from these missed visits in October 2024, respondent visited with Z.S. regularly.

¶ 39                                            4. Respondent

¶ 40    Respondent testified that, in addition to Z.S., she has two sons and two daughters. Respondent's parental rights were terminated as to one of her daughters. Aside from Z.S., all of respondent's children are now adults.

¶ 41    Respondent testified that she was just "getting to know" Herrera when he died in her apartment but acknowledged that he was her boyfriend. Herrera did not live with her.

¶ 42    During an unsupervised visit in the summer of 2023, respondent noticed that Z.S.'s toenail was cracked, he had a blister on his foot, and his shoes did not fit. Respondent told Z.S.'s foster father, J.B., that she was upset and sent angry text messages to E.B. Respondent acknowledged that one of Z.S.'s brothers was present at an unsupervised visit but denied that her boyfriend was present at any visits with Z.S. Respondent participated in parenting classes, domestic violence services, drug classes, individual therapy, counseling, and family therapy with Z.S. Through individual therapy, she was learning how to control her anxiety. She also voluntarily enrolled in additional drug classes because she struggled with addiction.

¶ 43                                                5. Ruling

¶ 44    The court found respondent unfit under section 1(D)(b) of the Adoption Act because she failed to maintain a reasonable degree of responsibility as to Z.S.'s welfare. Respondent did not comply with DCFS reporting requirements regarding other individuals being present at visits, and she was not forthright with DCFS about her relationship with Herrera. Respondent put Z.S. at risk because DCFS could not conduct a background check of Herrera. The court also highlighted respondent's threatening texts to the foster parents and her failure to take her psychotropic medication as risks to Z.S.

¶ 45    The court also found respondent unfit under section 1(D)(m)(ii) for failing to make reasonable progress toward Z.S.'s return in all nine-month periods the State alleged. The court reasoned that respondent was incarcerated at least twice in 2021 and 2022 and had two relapses of substance abuse in 2022. Her fixation on the foster parents hindered her progress in therapy. Most importantly, respondent regressed to supervised visitation and never returned to unsupervised

visitation. The court acknowledged that respondent attended services but reasoned that her attendance did not translate to meaningful progress toward Z.S.'s return home.

¶ 46                                    C. Best Interests Hearing

¶ 47    The court held a best interests hearing on January 13, 2025.

¶ 48                                    1. Krystle Miller

¶ 49    Miller testified that she visited Z.S. in his foster home on December 10, 2024. The foster home was safe and appropriate. Z.S.'s interactions with his foster parents were caring, nurturing, and comfortable. Z.S. referred to his foster parents as "Mommy" and "Daddy." They supported him participating in sports, including swimming and gymnastics, through the local park district. Z.S. expressed no concerns about living in the foster home. His medical, dental, and vision records were up to date.

¶ 50    Z.S. was in first grade and had an individualized education plan (IEP) due to developmental disabilities. He received support services through the IEP, and the foster parents hired additional tutoring for him. As a result, Z.S. was keeping up with his peers academically. The foster parents also ensured that Z.S. attended play therapy, family therapy, and visits with respondent. The foster parents supported Z.S.'s continued contact with respondent.

¶ 51    Miller concluded that adoption was in Z.S.'s best interest because he was bonded with and attached to his foster parents, they met all his needs, and he had connections to their extended family and community.

¶ 52                                    2. E.B.

¶ 53    E.B. testified that Z.S. was nonverbal when he came into her and J.B.'s care on December 17, 2020. Z.S. enrolled in an early intervention plan at school and had an IEP. E.B. and J.B.

attended his IEP meetings. E.B. also enrolled Z.S. in private tutoring, which improved his reading and writing abilities from the fifth percentile at the end of his first year of kindergarten to the fifty-eighth percentile by the end of his second year of kindergarten. Z.S. was at grade level and was "making leaps and bounds" in his academic progress. Outside of school, Z.S. enjoyed playing with other children in the neighborhood, swimming, and individual sports.

¶ 54    E.B. and J.B. took Z.S. to regular medical and dental appointments. Z.S. had cavities when he came into their care in 2020. E.B. applied anti-cavity medication and followed up with his dentist thereafter.

¶ 55    Before bedtime, Z.S. took a bath, brushed his teeth, and read books with E.B. and J.B. One of them stayed with him until he fell asleep because he was afraid of sleeping by himself. When Z.S. was upset, he cuddled with E.B. and J.B. and talked about what was bothering him.

¶ 56    Z.S. referred to E.B. and J.B. as "Mommy" and "Daddy," and they referred to him as their son. Z.S. referred to E.B.'s siblings as his aunts and uncles, and her parents as grandma and grandpa. He enjoyed visiting and having video calls with his extended foster family. Z.S. also had a bond with respondent and talked about her. E.B. and J.B. encouraged Z.S. to talk about respondent and to call her if he wanted to.

¶ 57    E.B. and J.B. would adopt Z.S. if respondent's parental rights were terminated. E.B. explained that Z.S. was "already family." She and J.B. loved and adored Z.S., planned their family outings around him, and wanted to raise him. If E.B. and J.B. adopted Z.S., they would continue his relationship with respondent so long as those interactions were appropriate. E.B. and J.B. "fully believe[d] in open adoption" and believed that Z.S.'s "connection with [respondent was] extremely important." E.B. collected photographs of Z.S.'s biological family so he could stay familiar with

them. E.B.'s relationship with respondent had improved in the six months prior to the best interests hearing.

¶ 58                                     3. Respondent

¶ 59    Respondent testified that she was living with a friend but planned to move to an apartment in Elmhurst on February 1, 2025. She was self-employed as a housecleaner.

¶ 60    Several weeks or months before the best interests hearing, respondent went roller skating with Z.S. and his foster parents. She also had several visits with Z.S., E.B., and Miller. Respondent and Z.S. talked and did activities during these visits, which respondent enjoyed. Respondent spoke to Z.S. on the phone three to four times over four to five months. Z.S.'s speech had improved from school and therapy.

¶ 61    Respondent acted out toward E.B. because one of respondent's other children had a negative experience in foster care. However, respondent loved E.B. and appreciated what she did for Z.S.

¶ 62                                     4. Julian Cortez

¶ 63    Julian Cortez, Z.S.'s older brother, was a senior at DePaul University at the time of the best interests hearing. He testified that he wanted to have a relationship with Z.S. and "help him grow up in life." Respondent talked to Julian about Z.S.; she "bragg[ed] about how much she loves him and missed him."

¶ 64                                     5. Ruling

¶ 65    The trial court found that termination of respondent's parental rights and adoption by the foster parents was in Z.S.'s best interests. The court reasoned that Z.S. was in a safe and appropriate foster home with up-to-date medical care and all necessary educational services. He was bonded

with his foster parents and referred to them as his mother and father. The court acknowledged that Z.S. had an emotional bond with respondent but explained that his foster parents had taken care of his daily needs for years. The court highlighted Z.S.'s academic and social progress while in foster care and his bonds with his extended foster family. The court terminated respondent's parental rights and subsequently entered a goal of adoption.

¶ 66    Respondent timely appealed.

¶ 67                                        II. ANALYSIS

¶ 68    On appeal, respondent contends that the trial court's unfitness and best interests findings were against the manifest weight of the evidence.

¶ 69    Section 2-29 of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-29 (West 2020)) creates a two-step process for the termination of parental rights. *In re M.I.*, 2016 IL 120232, ¶ 20. First, the State must prove by clear and convincing evidence that the parent is unfit as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). *In re M.I.*, 2016 IL 120232, ¶ 20; 705 ILCS 405/2-29(2) (West 2020). If the State establishes unfitness, the court then considers whether it is in the best interests of the child that parental rights be terminated. *In re M.I.*, 2016 IL 120232, ¶ 20.

¶ 70                                    A. Unfitness Hearing

¶ 71    In termination proceedings, the trial court must first determine the parent's fitness without considering the child's best interests or the likelihood of adoption. *In re J.W.*, 2024 IL App (1st) 231918, ¶ 18. The State must establish the parent's unfitness by clear and convincing evidence. *Id.* ¶ 20 (citing *In re C.N.*, 196 Ill. 2d 181, 208 (2001)). However, the State need establish only one

ground of unfitness under section 1(D) of the Adoption Act. *Id.* In this case, the trial court found respondent unfit under section 1(D)(b) and (D)(m)(ii).

¶ 72     On appeal, we consider whether the trial court's finding of unfitness was against the manifest weight of the evidence. *Id.* ¶ 21. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *Id.* (citing *McAllister v. Illinois Workers' Compensation Comm'n*, 2020 IL 124848, ¶ 30). We give great deference to a trial court's unfitness finding because the trial court has the best opportunity to view and evaluate parties, witnesses, and their testimony. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1064 (2006). Moreover, "[e]ach case concerning parental unfitness is *sui generis*, requiring close analysis of its individual facts; consequently, factual comparisons to other cases by reviewing courts are of little value." *Id.*

¶ 73     Under section 1(D)(m)(ii), a parent is unfit when she fails to make reasonable progress toward the child's return home during *any* nine-month period following the adjudication of abuse or neglect. 750 ILCS 50/1(D)(m)(ii) (West 2020). Whether a parent has made reasonable progress "is judged by an objective standard" and is "measured from the conditions existing at the time custody was taken from the parent." (Internal quotation marks omitted.) *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 62. Reasonable progress requires measurable or demonstrable movement toward the goal of reunification. *Id.* "Reasonable progress exists when the trial court can conclude that it will be able to order the child returned to parental custody in the near future." (Internal quotation marks omitted.) *Id.*

¶ 74     The evidence established that respondent made little progress, and in some respects *re*gressed, from the beginning of April 2023 through the end of December 2023, which was a nine-month period after the adjudication of abuse or neglect. See 750 ILCS 50/1(D)(m)(ii) (West 2020).

Respondent's unsupervised visits with Z.S. became problematic in April 2023. During a visit on April 1, 2023, Z.S. met a "loud man" who was mean to respondent. Z.S. later identified this man as Herrera, respondent's boyfriend who died of a drug overdose in her apartment. Herrera's unauthorized presence at a visit put Z.S.'s safety at risk, as did respondent concealing her relationship with Herrera from her DCFS caseworker and therapist. The service providers could not evaluate whether it was safe for Z.S. to be around Herrera if they did not know Herrera was in a relationship with respondent. When E.B. asked respondent about the "loud man" at the April 1, 2023, visit, she replied with angry, accusatory text messages, which began the deterioration of respondent's relationship with the foster parents. Also in April 2023, respondent caused Z.S. anxiety by telling him that he would return to her care soon, which was untrue. Additionally, she allowed Z.S. to ride in a stranger's car without a seatbelt. This evidence indicated that, in April 2023, Z.S.'s visits with respondent were more dangerous and stressful than productive.

¶ 75    The key turning point in this case occurred in early July 2023, when Herrera died of a drug overdose in respondent's apartment. Respondent had not disclosed Herrera's existence to DCFS or her therapist. As a result of that incident, respondent lost unsupervised visitation with Z.S. on July 29, 2023, and never progressed back to it. She also never progressed to overnight visitation at any point. A parent who regresses to supervised visitation months after adjudication despite engaging in services has not reasonably progressed to achieving reunification.

¶ 76    The following month, August 2023, respondent's inadequate housing disrupted at least one visit with Z.S. After respondent failed to appear for the visit, E.B. found her moving out of her apartment because someone had broken into it. This break-in, combined with Herrera's death by drug overdose in the apartment the month prior, indicated that respondent's environment was

unsafe for Z.S. In September 2023, CCJCC psychologist Dr. O'Donnell concluded that respondent was unlikely to achieve Z.S.'s return home.

¶ 77    Later in the fall of 2023, respondent's relationship with the foster parents broke down. The text messages respondent sent E.B. late at night in October or November 2023 threatened physical violence for no apparent reason. E.B. took these threats so seriously that she reported them to police and installed a home security system. Respondent developed and fixated on a baseless belief that E.B. and J.B. were trying to "steal" Z.S. from her or exploit him for money. Respondent spent most of her therapy sessions in the fall of 2023 fixating on this unfounded belief rather than focusing on reunification with Z.S. Respondent's irrational anger toward the foster parents also affected Z.S. during this time. After a visit on October 21, 2023, Z.S. told E.B. that he hated her because she was hurting respondent, and in December 2023, respondent told Z.S. that it was his own fault he was in DCFS custody. Also in December 2023, respondent was so disruptive at a child and family team meeting that she forced the meeting to end. This evidence showed that, in respondent's mind, Z.S.'s welfare was secondary to her "winning" an imagined dispute with the foster parents. At the end of 2023, Olaleye concluded that respondent could not parent Z.S. without supervision.

¶ 78    Between April 1, 2023, and the end of December 2023, there was no indication that Z.S. could be returned to respondent in the near future. Therefore, respondent did not make reasonable progress during that nine-month period. See *In re Je. A.*, 2019 IL App (1st) 190467, ¶ 62. The State established unfitness under section 1(D)(m)(ii).

¶ 79    Respondent argues that the State failed to establish unfitness because she completed most services. Although respondent *attended* most services, she did not make reasonable progress in the

*substance* of those services. For example, respondent attended individual therapy with Arceo but spent most therapy sessions in 2023 fixating on the foster parents rather than her reunification with Z.S. Merely participating in services does not constitute reasonable progress if the parent does not make progress in the underlying reasons for those services.

¶ 80    Respondent also contends that "poor judgment in her communication [with the foster parents] does not equate with parental unfitness." We disagree. Communication and conflict resolution are some of the most important skills children learn from their parents. A parent who addresses disputes—imagined, one-sided "disputes" in this case—by threatening violence and using profanity against the people caring for her child is not demonstrating reasonable progress.

¶ 81    Because we conclude that the trial court properly found respondent unfit under section 1(D)(m)(ii), we need not consider unfitness under section 1(D)(b). See *In re J.W.*, 2024 IL App (1st) 231918, ¶ 20 ("any one ground, if properly proven, is sufficient to support a finding of parental unfitness"). Accordingly, we affirm the trial court's finding of unfitness.

¶ 82                              B. Best Interests Hearing

¶ 83    Respondent also challenges the trial court's finding that termination of her parental rights and adoption by the foster parents was in Z.S.'s best interests.

¶ 84    Once the trial court has found a parent unfit, the State must prove by a preponderance of the evidence that termination of parental rights is in the child's best interests. *In re Faith S.*, 2019 IL App (1st) 182290, ¶ 93. At the best interests hearing, the trial court focuses on the needs of the child, and the parent's interest in maintaining the parent-child relationship yields to the child's interest in a stable and loving home life. *Id.*

¶ 85    In determining the best interests of a child under the Juvenile Court Act, the trial court must consider the following factors in the context of the child's age and developmental needs: (1) the physical safety and welfare of the child, including food, shelter, health, and clothing; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including (i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and a sense of being valued), (ii) the child's sense of security, (iii) the child's sense of familiarity, (iv) continuity of affection for the child, and (v) the least disruptive placement alternative for the child; (5) the child's wishes and long term goals; (6) the child's community ties, including church, school, and friends; (7) the child's need for permanence, which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives; (8) the uniqueness of every family and child; (9) the risks attendant to entering and being in substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2020).

¶ 86    The court may also consider the length and nature of the child's relationship with his present caretaker and the effect that a change in placement would have upon his emotional and psychological well-being. *In re Faith S.*, 2019 IL App (1st) 182290, ¶ 95. The court's best interests determination need not include explicit references to each of these factors, and a reviewing court need not rely on any basis used by the trial court in affirming its decision. *Id.*

¶ 87    We will not reverse a trial court's best interests finding unless it is against the manifest weight of the evidence. *Id.* A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly apparent. *In re J.W.*, 2024 IL App (1st) 231918, ¶ 21.

¶ 88    In this case, the best interest factors favor termination of respondent's parental rights so that E.B. and J.B. can adopt him. Z.S. has been in the care of his foster parents since he was three years old, *i.e.*, his entire conscious life. There is no dispute that Z.S. is safe, happy, healthy, and well cared for in their home, and there is no question that E.B. and J.B. want to adopt him. Z.S. calls them "mommy" and "daddy" and is attached to them. E.B.'s description of Z.S.'s bedtime routine and how he cuddles with her and J.B. when he is upset is compelling evidence of his bond with them. Z.S. also has bonds with E.B. and J.B.'s extended family and refers to them as his aunts, uncles, and grandparents. Z.S. has made significant academic progress in E.B. and J.B.'s care, going from nonverbal at age three to essentially grade level in first grade. Z.S.'s academic progress is due in large part to the private tutoring E.B. and J.B. hired and their involvement with his IEP. It is entirely reasonable to make the only consistent home Z.S. has ever known, and a home where he is happy and thriving, his permanent home. There is no reason to disrupt Z.S.'s life again by placing him in substitute care. The trial court's best interests finding was not against the manifest weight of the evidence.

¶ 89    Respondent argues that she has a strong bond with Z.S. and he enjoys their visits. That may be, but Z.S.'s best interests also include a safe and consistent home environment, medical care, education, and extracurricular activities. E.B. and J.B. can and do provide these things; respondent cannot and will not be able to do so in a time frame that makes sense. A parent's emotional bond with her child is only one factor of the best interests analysis, and standing alone, it is not enough to prevent termination of parental rights. See *In re Julian K.*, 2012 IL App (1st) 112841, ¶¶ 82-84.

¶ 90    Respondent also contends that Z.S. "would clearly be harmed if that contact were to cease." There is no reason to think that Z.S.'s contact with respondent will cease when his foster parents

adopt him. On the contrary, E.B. testified that she and J.B. fully support Z.S. having a relationship with respondent and that they take steps to ensure that occurs. The record contains no support for respondent's speculation that contact between her and Z.S. will end if her parental rights are terminated.

¶ 91    We also reject respondent's suggestion that the only way to ensure contact between her and Z.S. is for this case to continue until Z.S. is an adult, *i.e.*, for 10 more years. That is contrary to Z.S.'s interest in permanency, which is the focus of the best interests analysis. See *In re D.T.*, 212 Ill. 2d 347, 368 (2004) (children should not be left in "legal limbo" or "forced to confront years of uncertainty about whom [they] should call 'mom' and what place [they] should call 'home' ").

¶ 92    Respondent cites this court's decision in *In re D.T.*, 338 Ill. App. 3d 133 (2003), to argue that a trial court should not terminate a parent's rights when there is evidence that the parent is bonded with his or her child. To the extent the appellate version of *In re D.T.* is still good law— our supreme court reversed it in part in *In re D.T.*, 212 Ill. 2d at 350—it suggests that termination of parental rights may not be warranted if evidence such as therapist testimony establishes that breaking the bond between the parent and child would harm the child. *In re D.T.*, 338 Ill. App. 3d at 155; *In re L.G.*, 2025 IL App (1st) 241464, ¶ 42. As explained above, in this case, there is no risk that respondent and Z.S.'s bond will be severed. On the contrary, all witnesses agreed that Z.S. should and will maintain a relationship with respondent. Accordingly, we affirm the trial court's best interests finding and its termination of parental rights.

¶ 93                                    III. CONCLUSION

¶ 94    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 95    Affirmed.

---

***In re Z.S.*, 2025 IL App (1st) 250228**

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 20-JA-166; the Hon. Debjani D. Desai, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Bruce H. Bornstein, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John Nowak, Gina DiVito, and Marina C. Para, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain and Christopher J. Williams, of counsel), for other appellee. |

---