2025 IL App (1st) 242528

No. 1-24-2528

SECOND DIVISION
September 16, 2025

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| *In re* J.A., | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Minor-Appellee, | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | No. 21 JA 59 |
| Petitioner-Appellee, | ) | |
| v. | ) | |
| | ) | |
| M.H., | ) | Honorable |
| | ) | Levander Smith, |
| Respondent-Appellant). | ) | Judge Presiding. |

PRESIDING JUSTICE VAN TINE delivered the judgment of the court, with opinion. Justices Ellis and D.B. Walker concurred in the judgment and opinion.

**OPINION**

¶ 1 Following unfitness and best interests hearings, the circuit court terminated M.H.'s parental rights with respect to her minor son, J.A. On appeal, M.H. challenges only the court's finding of unfitness. For the following reasons, we affirm.

¶ 2 I. BACKGROUND

¶ 3    M.H. gave birth to J.A. on January 22, 2021. J.A. is now 4½ years old. He has lived with a foster family for most of his life, as he was taken into Department of Children and Family Services (DCFS) custody shortly after his birth. J.A.'s father, James, is not a party to this appeal, but we will discuss his issues when relevant in the context of this appeal as it relates to M.H.

¶ 4    On January 28, 2021, J.A. was taken into DCFS custody. On February 1, 2021, the State filed a petition for adjudication of wardship, and the court held a temporary custody hearing. The State alleged that J.A. was neglected due to an injurious environment and abused due to a substantial risk of physical injury.

¶ 5    In support, the State alleged the following. M.H. and James have two prior indicated reports for substantial risk of injury/environment injurious to health and welfare by neglect. M.H. and James have one other minor, K.A., in DCFS custody following an adjudication of wardship. K.A. was diagnosed with nonorganic failure to thrive while in the care of M.H. and James. M.H. and James have a history of domestic violence, and medical personnel have noted cognitive limitations in their interactions with the parents. James has been diagnosed with schizoaffective disorder. Return home was ruled out for J.A.'s sibling because the parents failed to engage in services including psychiatric assessments, medication monitoring, individual therapy, domestic violence courses, and parenting classes. The court granted temporary custody to DCFS. J.A. has been living with the same foster family as his brother K.A. since January 28, 2021.

¶ 6    On August 23, 2021, the court found J.A. neglected based on an injurious environment. See 705 ILCS 405/2-3(1)(b) (West 2020). At the dispositional hearing held on the same day, the court found both parents unable to care for J.A. The court adjudged J.A. a ward and granted DCFS custody of him. The initial permanency order entered the same day reflected a goal of return home within a year.

¶ 7    On October 25, 2022, about 14 months after the date of the adjudication, the court changed the permanency goal to substitute care pending court determination on termination of parental rights. The court reasoned that M.H. was not visiting J.A. consistently and "had a parenting capacity evaluation that brought up concerns with her intellectual functioning and mental health."

¶ 8    On April 12, 2023, the State petitioned the court for the appointment of a guardian with the right to consent to the adoption of J.A. The State alleged that M.H. was unfit under section 1(D)(b) and (m) of the Adoption Act (750 ILCS 50/1(D)(b), (m) (West 2022)). Section 1(D)(b) provides that a parent is unfit if she has failed to maintain a reasonable degree of interest, concern, or responsibility for the child's welfare. *Id.* § 1(D)(b). Section 1(D)(m) provides that a parent is unfit if she has failed to make reasonable efforts to correct the conditions that were the basis for removal of the child or failed to make reasonable progress toward the return of the child to her within any nine-month period after the adjudication of abuse or neglect (*id.* § 1(D)(m)). The State identified two nine-month periods with respect to section 1(D)(m): August 23, 2021, through May 23, 2022, and January 25, 2022, through October 25, 2022.

¶ 9    The circuit court held a bifurcated unfitness and best interests hearing in September 2024.

¶ 10                    A. Unfitness Hearing

¶ 11                    1. *Amanda Schenck*

¶ 12    Amanda Schenck, a foster care specialist who previously worked on K.A.'s case and subsequently worked on J.A.'s case, testified that recommended services for M.H. included parenting classes, a domestic violence program, substance abuse assessment, a psychological evaluation, and individual therapy. DCFS also recommended a parenting capacity assessment (PCA). The PCA report, dated August 7, 2022, noted that K.A.'s case began when DCFS investigated a report that M.H. struck James while he was holding K.A. A month before that

incident, she co-slept with K.A. who fell on the floor, and a safety plan was implemented. K.A. was diagnosed with nonorganic failure to thrive because he was not fed the appropriate amount of formula. The doctor who prepared the PCA report opined that M.H. qualified for a diagnosis of borderline intellectual functioning, even though the doctor who conducted the IQ examination in 2019 measured her IQ at 63, which classifies as "extremely low." Schenck was not concerned about M.H.'s seizure disorder itself but rather the side effects of her antiseizure medication and other medication. Schenck believed M.H. to be overmedicated, and this affected her ability to parent safely and effectively.

¶ 13    M.H. completed some recommended services, including domestic violence services and substance abuse evaluation and treatment, but continued to require individual therapy. M.H. completed a parenting class in Chicago that she found on her own, rather than the virtual one that DCFS recommended. The barrier to reunification was "the ongoing need for individual therapy with a satisfactory progress report over a substantial amount of time, as well as concerns for her relationship [James]."

¶ 14    As of October 25, 2022, M.H. had supervised visits twice a month with J.A. DCFS had not recommended unsupervised visits. During visits, M.H. would hold J.A., change his diapers, and feed him. M.H. never progressed to unsupervised visits.

¶ 15                                2. *Service Plans*

¶ 16    The State moved three service plans into evidence. The service plan dated February 17, 2021, noted that DCFS first became involved with the family when a safety plan was implemented for J.A.'s older sibling, K.A. That plan stated that K.A. had been diagnosed with nonorganic failure to thrive, and the risk factors included inappropriate feeding, domestic violence, and both parents' developmental delays. M.H. had a history of mental illness and cognitive delays and struggled to

stay compliant with her medications, appearing to be confused, drowsy, and unsteady on her feet. The February 17, 2021, service plan noted that the court ordered the following services at the dispositional hearing for K.A. in 2019: parenting classes tailored to M.H.'s needs, domestic violence classes tailored to M.H.'s needs, individual counseling, substance abuse assessment, a psychiatric evaluation, and a psychological evaluation. As of February 17, 2021, neither parent had completed these court-ordered services. M.H. had engaged in some services but "has not provided proof of stabilization regarding her mental health or medication management." The parents "appear[ed] to not understand the goal of termination."

¶ 17    The service plan dated July 26, 2021, rated M.H. as unsatisfactory with regard to individual counseling. M.H. had not provided proof of completion of a substance abuse assessment. She also had not provided any proof of her medication management, and communication between her and DCFS was poor. She had not signed consents for providers to communicate with DCFS and the caseworker, as required. Overall, the service plan appeared very similar to the plan dated February 17, 2021.

¶ 18    The service plan dated July 29, 2022, noted that M.H.'s

> "mental health and concerning demeanor are ongoing concerns for her ability to care for her child. She continues to appear drowsy and over-medicated when speaking with her. She appears to struggle to understand conversations and cannot answer questions asked of her, often giving an answer that does not make sense."

M.H. completed a psychological assessment and was diagnosed with an intellectual disability due to the "presence of severe problem behavior associated with medication side effects." The assessment noted that M.H.'s IQ was 63 and concluded that she "would still require support for parenting given suggested overall deficits in cognitive functioning for decision making."

¶ 19                                 3. *M.H.*

¶ 20    M.H. testified on her own behalf. M.H. stated that she attended a drug and alcohol abuse class twice a week for four months at the Human Resources Development Institute and earned a certificate of completion. She denied using drugs. M.H. also completed domestic violence services at Metropolitan Family Services (MFS) and a parenting class. She attended individual therapy and took antidepressants. M.H. had 20 seizures over her lifetime and took antiseizure medication. M.H. had supervised visits with J.A. at the DCFS office. M.H. acknowledged that she missed some visits with J.A. and that she still lived with his father, James.

¶ 21                         4. *M.H.'s Medical Records*

¶ 22    M.H.'s medical records from MFS indicate that she engaged in approximately 40 individual therapy sessions between April 2019 and May 2023. M.H. stated she wanted to get K.A. back and decrease her anxiety, depression, and anger. M.H., however, was absent from treatment for at least a two-month period around December 2020, and the therapist noted that she appeared unmotivated for counseling. M.H. also received psychiatric care at MFS. Notes from her psychiatric appointments reflect that she indicated she complied with her medication, except while pregnant with J.A.

¶ 23                 5. *James's Medical Records and Testimony*

¶ 24    James's medical records from Family Christian Health Center indicate he was diagnosed with and hospitalized for schizoaffective disorder. According to these records, it was "basically impossible to get accurate information" from James, and it was unclear whether he was taking medications. As of March 1, 2023, his schizoaffective disorder was noted to be "likely not controlled."

¶ 25    James testified on his own behalf. James reported having been diagnosed with schizophrenia and taking two medications. He participated in anger management services for a couple weeks. He participated in a jobs program for fathers at MFS for a couple weeks. He found these services himself and was willing to find more "if [he] had to."

¶ 26                              B. Best Interests Hearing

¶ 27    M.H. does not appeal the circuit court's ruling at the best interests hearing. Although there appears to be no dispute as to whether it is in J.A.'s best interest to terminate parental rights, we are cognizant that the State cannot do so unless it first meets its burden of proof in showing that M.H. is unfit. If the state fails to meet its burden by clear and convincing evidence, then there is no best interests hearing.

¶ 28                   C. The Circuit Court's Reasoning in the Bifurcated Hearing

¶ 29    The circuit court found M.H. unfit under both grounds (b) and (m). 750 ILCS 50/1(D)(b), (m) (West 2024). The court found her testimony not credible and Schenck's testimony credible. The court noted that Schenck's view that the barrier for reunification was M.H.'s ongoing need for therapy with satisfactory progress reports, as well as her cohabitation and relationship with James. The first service plan showed that M.H. was initially referred to Children's Home and Aid for individual therapy in 2018 but refused to attend. M.H. instead chose her own provider, MFS, which ultimately was not approved by DCFS. It was unknown whether M.H. was in therapy when J.A. was born or if M.H. completed a psychiatric evaluation at that time. The court also focused on the PCA, in which the examiner noted that M.H. was not open about her emotional status and some aspects of parenting, including physical abuse potential. The examiner could not conclude that M.H. was able to meet minimal parenting standards. The examiner also requested a statement from a physician regarding M.H.'s medication use but apparently did not receive it. The

assessment also noted that M.H. was diagnosed with depressed mood and that depression can interfere with parenting by causing a parent to be less attentive and motivated. The assessment expressed concern regarding M.H.'s weaker intellectual skills, noting that she would struggle in making good decisions and understanding all concerns when parenting, perhaps failing even to comprehend or define a problem. Apart from the assessment, the court noted the repeated unsatisfactory marks M.H. received on service plans.

¶ 30    The court then held a separate hearing on best interests and determined it was in J.A.'s best interest to terminate both parents' rights because the foster home had been the only home J.A. has ever known, he had bonded with the family, and his older brother lived there as well. On appeal, M.H. challenges only the court's finding of her unfitness; she does not appeal the court's best interests determination.

¶ 31                                     II. ANALYSIS

¶ 32    M.H. argues we should reverse the circuit court's finding of unfitness and should also reverse the order terminating her parental rights.

¶ 33    The Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West 2024)) and Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2024)), in conjunction, prescribe the authority and scope of the court to involuntarily terminate parental rights. *In re M.I.*, 2016 IL 120232, ¶ 19. Illinois policy favors parents' rights to custody of their own children. *Id.*

¶ 34    Section 2-29 of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2024)) provides a two-step process for the involuntary termination of parental rights. *In re M.I.*, 2016 IL 120232, ¶ 20. First, the court must find that the State has proved by clear and convincing evidence that the parent is unfit as defined in section 1 of the Adoption Act. *Id.*; 705 ILCS 405/2-29(2) (West 2024). If the court finds the parent is unfit, the court then considers whether the State has shown by a

preponderance of the evidence that termination of parental rights is in the best interest of the child. *In re D.T.*, 212 Ill. 2d 347, 367(2004).

¶ 35    M.H. argues that the circuit court's findings of unfitness were improper under section 1(D)(b) and (m) of the Adoption Act (750 ILCS 50/1(D)(b), (m) (West 2024)).

¶ 36    Section 1(D) of the Adoption Act provides, in relevant part:

> "D. 'Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption. The grounds of unfitness are any one or more of the following, except that a person shall not be considered an unfit person for the sole reason that the person has relinquished a child in accordance with the Abandoned Newborn Infant Protection Act:
>
> * * *
>
> (b) Failure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare.
>
> * * *
>
> (m) Failure by a parent (i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Actof 1987 or dependent minor under Section 2-4 of that Act, or (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act of 1987 or dependent minor under Section 2-4 of that Act. If a service plan has been established as required under Section 8.2 of the Abused and Neglected Child Reporting Act to

correct the conditions that were the basis for the removal of the child from the parent and if those services were available, then, for purposes of this Act, 'failure to make reasonable progress toward the return of the child to the parent' includes the parent's failure to substantially fulfill his or her obligations under the service plan and correct the conditions that brought the child into care during any 9-month period following the adjudication under Section 2-3 or 2-4 of the Juvenile Court Act of 1987. Notwithstanding any other provision, when a petition or motion seeks to terminate parental rights on the basis of item (ii) of this subsection (m), the petitioner shall file with the court and serve on the parties a pleading that specifies the 9-month period or periods relied on." *Id.*

It is important to note that although the State may rely on several grounds in its petition, a finding of unfitness on any one ground is sufficient to support termination of parental rights. *In re C.W.*, 199 Ill. 2d 198, 217 (2002). We will reverse the circuit court's findings only if they are against the manifest weight of the evidence. *In re N.G.*, 2018 IL 121939, ¶ 29. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *In re Arthur H.*, 212 Ill. 2d 441, 464 (2004). "Because a trial court is in a superior position to assess the credibility of witnesses and weigh the evidence, a reviewing court will not overturn the trial court's findings merely because the reviewing court may have reached a different decision." *In re April C.* 326 Ill. App. 3d 245, 257 (2001) (citing *In re Lakita B.*, 297 Ill. App. 3d 985, 994 (1998)). "Ultimately, there is a 'strong and compelling presumption in favor of the result reached by the trial court' in child custody cases." *In re William H.*, 407 Ill. App. 3d 858, 866 (2011) (quoting *Connor v. Velinda C.*, 356 Ill. App. 3d 315, 323 (2005)).

¶ 37    We first review the circuit court's finding of unfitness under section 1(D)(m). Section 1(D)(m) provides two bases for a finding of unfitness: (i) the failure by the parent to make reasonable efforts to correct the conditions that were the basis for the removal of the child, *or* (ii) the failure to make reasonable progress toward the return of the child during any nine-month period after the adjudication of abuse or neglect. *In re C.N.*, 196 Ill. 2d 181, 210-11 (2001).

¶ 38    Under subsection (D)(m)(ii), the court assesses "reasonable progress" under an objective standard based on the amount of progress measured from conditions existing at the time custody was taken from the parent. *In re Daphnie E.*, 368 Ill. App. 3d 1052, 1067 (2006). "At a minimum, reasonable progress requires measurable or demonstrable movement toward the goal of reunification." *Id.* Our supreme court has held that the appropriate benchmark for measuring progress

> "encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *In re C.N.*, 196 Ill. 2d at 216-17.

A court should find reasonable progress satisfied where it can conclude that it will be able to order the children returned to parental custody in the near future. *In re Daphnie E.*, 368 Ill. App. 3d at 1067. Failure to make progress during any nine-month period is sufficient to support a finding of unfitness. The State's petition to terminate parental rights identified these two following nine-month periods with respect to subsection (D)(m)(ii): (1) August 23, 2021, through May 23, 2022, and (2) January 25, 2022, through October 25, 2022.

¶ 39    We affirm the circuit court's finding that the State established respondent's failure to make reasonable progress between January 25, 2022, and October 25, 2022. According to the July 29,

2022, service plan, M.H. was unable to understand questions and responded to them in a way that was irrelevant or made no sense. This raises concerns regarding whether she was compliant with taking the correct medications for her underlying mental health issues and whether she had understood content of the substance abuse program she completed. The reason M.H.'s son K.A. was removed from her care was because she was unable to give him the correct amount of formula. If M.H. does not have the capacity to understand a simple conversation, we have serious doubts as to her ability to decide how much formula to give, when to change diapers, how to identify problems, and so on.

¶ 40     Although the record does not contain a service plan after the July 29, 2022, service plan, Schenck testified, at the unfitness hearing in September 2024, that she had worked on J.A.'s case through December 2023. She averred that, at no point between August 2021 and October 2022 could she have recommended unsupervised visits with J.A. for M.H. or James. This was because M.H.'s home was "not a safe environment," and "M.H. and James had not corrected the conditions that brought the child into care."

¶ 41     We stress that M.H. has *never* progressed to receiving even one unsupervised visit with J.A. Based on the July 29, 2022, service plan, Schenck's testimony, as well as the parenting capacity assessment, M.H. has not made reasonable progress regarding her mental health and substance abuse issues. These were both crucial deficiencies which she needed to address and on which she needed to progress since J.A.'s birth.

¶ 42     Schenck also testified that M.H. would need individual therapy over a longer period of time, with satisfactory progress. There is no indication that M.H. has been consistent with therapy or that the therapy has been effective in ameliorating her anxiety, depression, and anger management and cognitive issues.

¶ 43　We hold that merely attending therapy is insufficient to demonstrate reasonable progress. Merely participating in services does not constitute reasonable progress if the parent does not make actual progress in addressing the underlying reasons for those services. *In re Z.S.*, 2025 IL App (1st) 250228, ¶ 79.

¶ 44　M.H. has a history of inappropriate co-sleeping practices and not knowing how much formula to give an infant. These are two fundamental aspects of parenting young children, and M.H. has not progressed in any services that would address this deficiency.

¶ 45　Moreover, her continued cohabitation with James, who suffers from schizoaffective disorder but refuses services, shows lack of reasonable progress. The service plans identified cohabitation with James as a risk factor. James has refused the recommended services, while M.H. has partaken in a few. If M.H. chose to work toward keeping J.A. in the same environment as James rather than ending her cohabitation with him, *both* she and James must have been willing and able to engage in, progress in, and complete services prior to reunification.

¶ 46　Based on the foregoing, we conclude that the circuit court's finding that M.H. was unfit under section 1(D)(m)(ii) was not against the manifest weight of the evidence. Rather, its finding was well-supported by the evidence. Because we conclude that the circuit court properly found respondent unfit under subsection (D)(m)(ii), we need not consider unfitness under subsection (D)(m)(i) or (D)(b). See *In re J.W.*, 2024 IL App (1st) 231918, ¶ 20 ("any one ground, if properly proven, is sufficient to support a finding of parental unfitness"). Accordingly, we affirm the circuit court's finding of unfitness.

¶ 47　　　　　　　　　　　　　III. CONCLUSION

¶ 48　For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 49　Affirmed.

---

*In re J.A.*, 2025 IL App (1st) 242528

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 21-JA-59; the Hon. Levander Smith, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Sharone R. Mitchell Jr., Public Defender, of Chicago (Samuel M. Hayman, Assistant Public Defender, of counsel), for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, Ashlee Cuza, and Marina Para, Assistant State's Attorneys, of counsel), for the People. |
| | Charles P. Golbert, Public Guardian, of Chicago (Kass A. Plain and Mary Brigid Hayes, of counsel), for appellee. |